# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SMASH FRANCHISE PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0302-JTL |
| | ) | |
| KANDA HOLDINGS, INC., TODD | ) | |
| PERRI, and DUMPSTER DEVIL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 5, 2023
Date Decided: July 14, 2023

Richard I.G. Jones, BERGER HARRIS LLP, Wilmington, Delaware; Tracy N. Betz, Neil Peluchette, TAFT, STETTINIUS & HOLLISTER LLP, Indianapolis, Indiana; *Attorneys for Plaintiff.*

Andrew L. Cole, COLE SCHOTZ P.C., Wilmington, Delaware; Steven K. Fedder, FEDDER & JANOFSKY LLC, Baltimore, Maryland; *Attorneys for Defendants.*

**LASTER, V.C.**

Plaintiff Smash Franchise Partners, LLC ("Smash") sells franchises. The franchised business involves smashing trash in dumpsters using a rotating drum attached to a hydraulic boom mounted on a Smash-branded truck. Smashing lets customers pack more trash into each dumpster load, so the customers save on the per-pickup fees that waste management companies charge for hauling away dumpsters.

Todd Perri expressed interest in a Smash franchise. He soon concluded that with his experience as an engineer and entrepreneur, he could create his own mobile trash compaction company. Despite deciding not to buy a franchise, Perri continued to feign interest and gather information from Smash about the mobile trash compaction business.

Perri and his college fraternity brother, Kevin McLaren, formed Dumpster Devil LLC to sell Dumpster Devil-branded trash compacting equipment. On their website, they compared their equipment and the economic returns a buyer could generate with Smash's equipment and the economic returns a franchisee might expect.

Smash filed this lawsuit against Perri, McLaren, and Dumpster Devil.[1] During the initial, expedited phase of the case, Smash sought a preliminary injunction that would have shut down Dumpster Devil's business. Smash's scattershot application invoked eight different legal theories: breach of a non-disclosure agreement, unjust enrichment, misappropriation of trade secrets, conversion, unfair competition, fraud, deceptive trade

---

[1] Smash also sued Kanda Holdings, Inc., a shell company whose sole stockholder is Perri. When Perri first engaged with Smash, he did so through Kanda. The distinction between Perri and Kanda is not meaningful for this decision, which for simplicity refers only to Perri.

practices, and trademark infringement. The court denied Smash's request for a business-stopping injunction. *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *1 (Del. Ch. Aug. 13, 2020) (the "Injunction Decision"). The Injunction Decision held that Smash had demonstrated a reasonable likelihood of success on only two of its claims: for fraud based on Perri misrepresenting his interest in a franchise and for violations of the Delaware Uniform Deceptive Trade Practices Act ("DUDTPA") based on three comparisons on Dumpster Devil's website. The Injunction Decision held that Smash had not demonstrated a reasonable likelihood of success on the merits of its other claims, had not shown a sufficient threat of irreparable harm for a business-stopping injunction, and had not shown that the balance of hardships favored preliminary relief of that magnitude. The court entered a limited preliminary injunction that barred Dumpster Devil pending trial from making the three comparisons on its website.

After the Injunction Decision, the parties litigated on a non-expedited track. Nearly a year later, Smash dropped its claims for conversion and trademark infringement. More than a year after that, and only a month before trial, Smash informed the court and the defendants that it would not try its claims for breach of contract, unjust enrichment, misappropriation of trade secrets, or unfair competition. The only remaining claims were for fraud and for violating DUDTPA. Neither claim named McLaren as a defendant. The court has entered judgment for McLaren and dismissed him from the case.

For its fraud claim, Smash seeks to prove that Perri fraudulently induced Smash into revealing information by falsely representing that he was interested in a franchise. As a remedy, Smash asks for $3,427,091 in lost profits stemming from the head start that

2

Dumpster Devil allegedly obtained by surreptitiously receiving training from Smash. According to Smash, it would have taken Perri and McLaren sixteen more months to get Dumpster Devil off the ground without the training that Perri received, and during that sixteen months, Smash would have sold five more franchises. As damages, Smash seeks the present value of the profits that those franchises would have generated.

Smash's fraud claim fails because the Delaware Uniform Trade Secrets Act ("DUTSA") preempts it. DUTSA preempts all common law claims based on conduct that otherwise would give rise to a claim under DUTSA if the misappropriated information qualified as a trade secret. Smash contends that Perri's fraud enabled him to misappropriate its information. Smash tries to sidestep DUTSA by inaccurately characterizing the information Perri obtained as training, but Perri was not receiving training. He was listening to calls designed to encourage prospects to buy a franchise. Regardless, training is a form of information, so the characterization does not change the preemption analysis. DUTSA preemption applies.

Absent preemption, the fraud claim still fails because Smash has not carried its burden of proving causally related damages. When Perri approached Smash, it was still a new and unproven franchisor. To make up for its lack of a track record, Smash provided interested candidates with lots of information to convince them to purchase a franchise. Before Perri decided not to pursue a franchise, he legitimately obtained considerable information from Smash. Although Perri continued to participate in calls that Smash hosted after he decided not to purchase a franchise, Perri did not learn additional information that could have caused the damages Smash sought.

3

For its claim under DUDTPA, Smash relies on the same statements on the Dumpster Devil website that the Injunction Decision addressed. As a remedy, Smash seeks (i) a permanent injunction barring Dumpster Devil from making disparaging statements about Smash, (ii) the trebling of the damages awarded on its fraud claim, and (iii) its attorneys' fees and costs. Smash is not entitled to any of those remedies.

After the Injunction Decision, the parties agreed that one of the statements was accurate. Smash nevertheless tried to prove at trial that the statement was false, but it could not overcome its stipulation. Smash succeeded in proving that the other two statements violated DUDTPA, but grounds do not exist for permanent injunctive relief, and there are no damages to treble. Moreover, Perri and McLaren had a good faith belief that their statements were accurate, which makes the trebling of damages inequitable and renders an award of fees and costs unjustified.

Perri, McLaren, and Dumpster Devil sought their attorneys' fees and costs under DUTSA on the theory that Smash pursued that claim without a good faith basis after the Injunction Decision, only to drop the claim on the eve of trial. Smash had a weak claim, but it was not so weak as to warrant fee shifting.

Neither side in this case deserves any relief. Smash pursued an aggressive lawsuit that made overblown claims in an effort to destroy a nascent competitor. That gambit failed, and the litigation has inflicted collateral damage on Smash's founder. Discovery revealed that an arbitrator found that he had engaged in fraud, and that fact became public through this litigation. In addition, this court has discredited his testimony on multiple points. Perri and McLaren have not fared better. The court criticized their conduct in the

4

Injunction Decision, and this decision has found that Perri engaged in fraud, albeit fraud that did not cause any compensable damages. Through the financial and personal consequences of this extensively litigated case, each side has received its just desserts. Each side will bear its own costs.

## I.  FACTUAL BACKGROUND

The facts are drawn from the record presented at trial. The parties introduced 267 exhibits along with nineteen depositions. Three fact witnesses and four expert witnesses testified live.[2]

The principal witnesses for both sides suffered from credibility problems. Justin Haskin is the founder of Smash and was its principal fact witness. Six months before trial, an arbitrator found that Haskin made "serious financial performance misrepresentations and omissions" in Smash's franchise disclosure document (the "Smash Disclosure Document"). Dkt. 314, Ex. A at 14–17. The arbitrator found that prospective franchisees had relied on Haskin's misrepresentations and suffered damages. *Id.* In this litigation, Haskin exaggerated the confidential nature of the information Smash gave to would-be franchisees. The court declined to credit parts of his testimony.

---

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Dkt. 312. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit, with the page designated by the internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section.

Perri is one of the founders of Dumpster Devil and was its principal fact witness. During the events giving rise to this case, Perri engaged in deceitful conduct. Most notably, after deciding not to purchase a franchise from Smash, he continued to participate in calls that Smash hosted for potential franchisees. At trial, Perri's credibility was impeached repeatedly, and he had frequent failures of memory. Overall, he was even less credible than Haskin. On key points, however, the contemporaneous documents support Perri's account, and McLaren backed him up.

McLaren is a stereotypical engineer who appears to lack the soft skills that would have cast his contemporaneous communications in a better light. He preferred that Perri join him in starting a competing business rather than buying a Smash franchise, and he worked with Perri to that end. In the Injunction Decision, the court largely lumped McLaren together with Perri. By the time of trial, McLaren was no longer a defendant on any claims, and the record showed that McLaren did not join in Perri's deceitful conduct. During his testimony, McLaren generally stuck to the facts. Of the three principal witnesses, he was the most credible.

The record presented at trial established the following facts by a preponderance of the evidence.

A.    **Smash's Business**

Starting in 2015, Haskin developed a plan to "disrupt the commercial waste industry" by providing trash compaction services at the customer's place of business. Haskin Dep. 35. Through a mobile trash compaction service, Haskin planned to "help customers save on trash hauling fees and reduce emissions." Dkt. 303 at 6.

6

Haskin founded Smash and serves as its President and CEO. In March 2016, Haskin started a local trash-smashing business in Houston. Shortly thereafter, Haskin opened similar businesses in Austin, Dallas, and San Antonio. After proving his concept, Haskin shifted to a franchise model. Smash sold its first franchise in April 2019, and its first franchisee began operating in October.

In YouTube videos, Smash shows its truck-mounted compactor smashing trash. The unit is a serrated drum attached to a hydraulic boom and mounted on the bed of a truck. The operator lowers the drum into a dumpster, then uses the drum to compact trash. The videos describe how much a customer can save by contracting with Smash.

**B.      Perri Asks About A Smash Franchise.**

Perri is a serial entrepreneur who holds a Bachelor of Science in Mechanical Engineering from Carnegie Mellon University, a Master of Science in Mechanical and Aerospace Engineering from Princeton University, and a Master of Business Administration from Stanford University. Perri learned about Smash when he replied to an advertisement on the website bizbuysell.com. The advertisement stated, "Commercial Waste Management – patent pending technology." PTO ¶ 6. Trish Scelfo, an independent franchise broker, posted the advertisement for Smash.

Scelfo responded to Perri's inquiry. During an initial call on December 4, 2019, Scelfo pitched Perri on buying a Smash franchise. She gave him an overview of Smash's business and equipment, including information about where Smash obtained its equipment, where the franchises were located, and where Smash had available territories. She discussed the types of businesses that are a franchisee's principal customers, as well as

7

Smash's plan to benefit franchisees by pursuing relationships with nationwide businesses (so-called national accounts). She also discussed competition in the industry, both locally and for national accounts. She explained to Perri what the start-up and operating costs would be and what software he would use to run a franchise.

Scelfo referred Perri to Smash's website and its YouTube channel. Scelfo also sent Perri a pitch deck about Smash and its business model. The pitch deck described Smash's strategy of being first to market. It also described what Smash views as its principal competitive advantage: operating as a trucking business rather than a waste management business. As Smash portrays it, a waste management business empties a dumpster when a customer calls and charges the customer for each visit. A trucking company establishes routes that its trucks follow regularly and charges its customers a flat fee. Smash describes its operating model as a UPS route without the boxes. Haskin Tr. 39–40.

The pitch deck identified the steps involved in obtaining a franchise. First, a prospect has an introductory call and receives the pitch deck and Smash Disclosure Document. Federal law requires that a franchisor have a franchise disclosure document and that it be publicly available. The document must contain the information necessary for a franchisee to make an informed decision about whether to enter into a franchise relationship. *See* 16 CFR § 436. Fourteen states require that a franchisor file an additional disclosure document under state law. *See, e.g.*, Cal. Corp. Code § 31500.

The Smash Disclosure Document contains extensive information, including:

- the initial investment required for a franchise, broken down by line item;

- the expected financial performance for a franchise;

8

- the estimated size of a Smash franchise territory by population;

- the number of trucks a franchisee needs to purchase as a function of the number of territories;

- the number of trucks a franchisee needs to purchase as a function of the volume of business conducted;

- the manufacturer of Smash's equipment; and

- the number of existing Smash franchises.

*See* JX 4. Smash does not consider the information in the Smash Disclosure Document to be confidential. Nor could it, because federal law requires that the document be publicly available. Smash also does not consider the information in the pitch deck or the introductory call to be confidential.

Next, a prospect participates in a call to learn about the economics of a franchise, including the start-up and operating costs (the "Unit Economics Call"). After the Unit Economics Call, the prospect receives an Excel workbook containing the economic data (the "Unit Economics Worksheet"). Smash does not consider the information in the Unit Economics Call or the Unit Economics Worksheet to be confidential.

After the two introductory calls, a prospect can attend "Discovery Day," when prospects travel to Smash's home office and learn about Smash's "secret sauce." To attend Discovery Day, a prospect must sign a non-disclosure agreement ("NDA").

After the initial qualification call, a prospect can participate in two types of Zoom calls. One type, called a "Franchisee Forum Call," occurs every other week on Thursdays. Current franchisees host the call, describe how they run their franchises, and answer questions. No one from Smash participates in the Franchisee Forum Calls, and Smash

9

disclaims any responsibility for the information that the franchisees provide. The Franchisee Forum Call is part of Smash's sales effort for franchises and is designed to show prospects how easy it is to run the business and make money.

The other type of call, called a "Founder Call," takes place on Wednesdays. Haskin hosts the call, discusses Smash's history, explains his vision for the future, and answers questions. The Founder Call is also part of Smash's sales effort for franchises and is designed to convince prospects that they would be joining an innovative organization with a bright future.

Prospects can attend any number of Franchisee Forum Calls and Founder Calls, or they can skip them. Discovery Day is mandatory. A prospect can only apply for a franchise after attending Discovery Day. If Smash approves the application, then the prospect and Smash sign a franchise agreement.

Inherent in this multi-stage process is the possibility that a prospect can decide against purchasing a franchise at any point. By the same token, Smash can decide at any point to reject a prospect.

It is only *after* a prospect signs a franchise agreement that Smash provides detailed training about how to operate a Smash franchise. The curriculum involves sixty-four hours of study and includes both classroom and on-the-job components. Smash also provides its franchisees with an extensive operating manual that contains 220 pages of information and procedures for running a Smash franchise.

## C.  Perri Speaks With Fastlane.

Perri told Scelfo that he was interested in a franchise. Scelfo referred Perri to Brittany Bode, the Director of Franchise Development for Franchise Fastlane, Inc. ("Fastlane"). Fastlane was an independent contractor that acted as the exclusive sales representative for Smash franchises. Fastlane took prospects through the process from the introductory call to the signing of the franchise agreement. As part of that process, Fastlane set up and ran the Franchisee Forum Calls and Founder Calls.

On December 5, 2019, Bode and Perri had his introductory call. Bode described the history of Smash, the number of its current franchises, their locations, the identity of one of Smash's national accounts, the software required to run the business, and how Smash divides responsibilities between the franchisor and franchisees.

On December 9, 2019, Perri attended a Unit Economics Call that Bode conducted with several prospects. She discussed the start-up costs and operating expenses of a franchise in detail.

After the Unit Economics Call, Bode sent Perri the Unit Economics Worksheet, a copy of the Smash Disclosure Document, and an NDA. Up to this point, Perri had not signed an NDA. Without an NDA, Smash and its representatives had freely provided Perri with information during three telephone calls. Smash and its representatives had also sent him the pitch deck, the Unit Economics Worksheet, and the Smash Disclosure Document. As noted, Smash does not regard that information as confidential.

Perri told Bode that he was interested in pursuing a franchise. She told him that the next step was to attend Discovery Day, which required signing the NDA. Perri told Bode

11

that he wanted to attend the next Discovery Day, scheduled for January 6 and 7, 2020. He signed and returned the NDA.

**D.    Perri And McLaren Discuss A Competing Business.**

After signing the NDA and telling Bode that he was interested in a franchise, Perri texted with and then called McLaren. Like Perri, McLaren holds a Bachelor of Science in Mechanical Engineering from Carnegie Mellon, where they were fraternity brothers. McLaren owns and operates a roll-off dumpster business and a commercial landscaping business.

Perri asked McLaren for advice about franchises. After their conversation, McLaren spoke to a friend who worked as a broker for Smash. McLaren's friend gave him an old version of the Smash Disclosure Document. After reviewing it, McLaren cautioned Perri against a franchise. McLaren had a bad experience with a franchise, and he saw similarities in the Smash Disclosure Document. He told Perri that the franchise relationship was going to be "one-sided." McLaren Tr. 277. Having been burned before, McLaren was not willing to enter into a franchise relationship with Smash under any circumstances.

Perri and McLaren then discussed whether they could develop their own mobile trash compaction business. For two mechanical engineers who were experienced entrepreneurs, it did not seem like a challenging market to enter.

The key issue for Perri was whether Smash had any enforceable intellectual property rights, such as a patent. If Smash owned a patent, then there were two related implications. The first was that if Smash had a patent, then starting a competing business was less attractive, because Smash could potentially enforce its patent to secure an injunction. At a

12

minimum, Perri and McLaren could face a lawsuit that would be expensive to defend. The second implication was the converse of the first. With a patent, buying a Smash franchise became more attractive, precisely because the patent offered protection. *See* JX 41 at '131.

Whether Smash had intellectual property rights became a key input in Perri's decision. If Smash had a patent, then Perri would likely buy a Smash franchise. If Smash did not have a patent, then Perri would likely start a competing business with McLaren.

## E. The Dual Tracks

Because of the significance of the patent issue, Perri decided to proceed on two tracks. Along one track, he gathered information to evaluate whether Smash had a patent. Along the other track, he and McLaren made preparations to start a competing business if it turned out that Smash did not have a patent.

### 1. Perri's First Franchisee Forum Call

On December 11, 2019, Perri joined his first Founder Call. Fastlane hosted the call using Zoom, a web-based video-conferencing application. Bode had sent Perri a meeting ID code that Fastlane used for all of the Smash-related calls. Anyone with the code could access any of the Founder Calls and Franchisee Forum Calls. Zoom has features that a host can use to control who participates in a meeting, such as password access and a waiting room. Fastlane did not use those features. Anyone with the ID code could join.

After logging in, Perri discovered that the call had been canceled because Haskin was attending a Discovery Day. Two other prospects had joined, and Perri talked with them before leaving.

13

By this point, Perri was leaning against buying a franchise from Smash. He told McLaren, "They [Smash] seem to be quite dysfunctional. I think they're in a trademark dispute with the other guys. Unless there is something preventing me from mounting this gadget on a truck myself, I'm wondering why I would work with either of these companies." JX 36. McLaren responded that they "could buy a flat bed truck and put a mini excavator on it with a long reach boom and use a hydraulic attachment to do the same thing." JX 37.

Perri had already identified a manufacturer who might build them a machine, but he told McLaren to wait. JX 38. Perri still had questions about whether Smash had any intellectual property that might make a franchise worthwhile. *See id.*

On December 12, 2019, Perri joined his first Franchisee Forum Call. The invitation said that different franchisees would host different calls and that "[y]ou are invited to attend as many Franchisee Forum calls as you like." JX 61. Smash disclaimed any responsibility for the information that the franchisees provided: "Please understand that the franchisee's answers are their answers. Whatever they say is based on their experience." *Id.*

During the December 12, 2019 call, several franchisees spoke. They covered

- how many smashes a truck could complete in an hour;
- how many smashes a franchise could complete in a week;
- pricing for scheduled smashes versus on-demand smashes;
- types of customers and the per-month revenue from specific customers;
- how they used Google Earth to identify customers;
- which types of businesses made good customers;

14

- how they pitched potential customers; and

- potential conflicts with dumpster owners and strategies for resolving them.

JX 134 at '878–80.

On December 13, 2019, Perri registered to attend Discovery Day in Indianapolis on January 6 and 7, 2020. Fastlane required some proof that a prospect had made travel arrangements to attend Discovery Day as evidence of the prospect's commitment. Perri bought a plane ticket on December 13 and sent his proof of purchase to Fastlane. He also reached out to a college friend who lived in Indianapolis to see if they could meet up. Perri's friend accepted the invitation and put it on his calendar.

The next day, Perri canceled his ticket. At trial, Perri said that he canceled his flight because he had not yet identified a specific date to meet his friend. He explained: "I thought, well, I don't know exactly when Bob and I are going to meet. I'm going to presumably have to change my flight. So it's just easier if I'll cancel it and then I'll rebook it once Bob gets back to me." Perri Tr. 167–68.

Perri did not tell Fastlane that he had canceled his flight. He also did not cancel his registration for Discovery Day. But Perri also did not tell his friend that he was no longer coming.

Smash argues that Perri had already decided not to purchase a Smash franchise and that buying and immediately cancelling his ticket was part of Perri's fraud. When the court ruled on Smash's application for preliminary injunction, the factual record at that phase of the case made it reasonably probable that the purchase and cancellation was a ruse. Together with other evidence, the court thought it reasonably likely that Perri had decided

15

not to purchase a Smash franchise on December 12, 2019, and that from then on, Perri was misleading Smash. *See* Injunction Decision, 2020 WL 4692287, at \*5, \*16.

At trial, McLaren and Perri explained credibly why discerning whether Smash had a patent was critical to whether they started a competing business. That testimony and other contemporaneous evidence, such as Perri's communication with his friend, has caused this decision to make a different factual finding about when Perri decided against pursuing a franchise. On December 12, 2019, and during the time when he made and then cancelled his travel arrangements for Discovery Day, Perri was still deciding what to do.

Based on the trial evidence, Perri's decision to cancel his flight is something that looks bad in hindsight, but was not significant in real time. Perri still intended to attend Discovery Day and purchase a franchise—if Smash owned a patent. But Perri was also preparing to operate a competing business if Smash did not have a patent. For example, on December 15, 2019, Perri registered the domain name "DumpsterDevil.com." He also contacted a potential supplier and asked about purchasing equipment.

### 2. Perri's First Founder Call And Second Franchisee Forum Call

On December 18, 2019, Perri dialed into another Founder Call. This one was not canceled, so it was the first real Founder Call that Perri attended. During the call, Haskin discussed a variety of topics, including

- the history of the company;

- the current state of the company;

- the forty-one franchise territories that Smash had sold across the United States;

16

- the value that Smash brings to its customers by typically saving them between 25% and 30% in waste disposal fees;

- his preference for per-month pricing rather than per-smash pricing;

- his belief that Smash franchisees could work collaboratively with local waste management companies;

- current growth opportunities and the need to promote customer awareness; and

- the potential benefits of working with national accounts and developing a franchisee referral network so that franchisees could refer business to each other.

JX 134 at '877–78.

Importantly for Perri, Haskin talked about Smash's intellectual property rights. Haskin explained that Smash had trademarks and that its machine was "patented in [Europe]" with a patent pending in the United States. *Id.* at '877. But he also warned that "[a]nything this disruptive will be copied" and that enforcing a "utility patent," *i.e.*, a patent on the method for conducting business, would be difficult. *Id.* He said that Smash was in "a race to get first to market." *Id.* He warned that if push came to shove, the trash-smashing machine could be "copied down to the bolt." *Id.*

Later in the call, another participant asked about Smash's claim about a patent pending. Haskin reiterated that the patent was "on [the] machine" and "not a process patent re smashing." *Id.* at '878. He repeated that "this is a race," said "someone will copy it," and stated that he "wants to be in 150 mkts with 1-2 yr contracts" so there would be a "barrier to entry for someone [who] comes in." *Id.*

Perri thought Haskin's statements were contradictory. On the one hand, he seemed to be claiming that Smash had some form of patent on its equipment. On the other hand,

17

he seemed to be conceding that there was no protection for the business model and that everything could and would be copied. Perri thought the latter was true and that Haskin was trying to hedge so that prospects were more eager to purchase a franchise. In his notes, Perri wrote, "Does not have it." *Id.* at '877. By that he meant that he did not think that Smash had a patent.

On December 19, 2019, Perri participated in a second Franchisee Forum Call. The franchisee hosting the call reported that he was following Haskin's advice and signing local contracts with national accounts, including a national amusement park chain. He also spoke about his interest in a referral network and the possibility of working with waste management firms to offer national accounts a volume-based pricing model. Under this model, the national account would pay for trash hauling by weight, which would align the interests of the waste management firm with those of the Smash franchise.

Meanwhile, on the same day as the Franchisee Forum Call, McLaren contacted Husmann Umwelt Technik, GmbH ("Husmann"), the manufacturer of the truck that Smash used. Perri had asked McLaren to contact Husmann because Perri did not "want them to have [his] name at this point." JX 64 at '213. During the injunction phase, the court viewed Perri's comments as part of his effort to mislead Smash by concealing his involvement. Based on the more developed record at trial, this decision credits that when Perri made this comment, he was still considering a Smash franchise and could have decided to take that route if Smash had a patent. Perri did not want to jeopardize his ability to purchase a franchise by having Husmann potentially give his name to Smash.

18

McLaren asked Husmann for a price quotation to supply trucks to Dumpster Devil. Husmann declined because it had an exclusive arrangement with Smash. McLaren then looked for alternative suppliers and contacted a Husmann distributor to learn more about their machinery. JX 63 at '387. He told Perri that "[h]aving used units to play with while we wait for a new unit could help us get to market quicker." JX 50 at '168. Perri agreed. *Id.* at '169.

## F.     Perri Decides To Create A Competing Business.

By the afternoon of December 19, 2019, based on his research and the three calls he had attended, Perri was all but convinced that Smash did not have a patent that could pose a threat to a competing business. At 4:55 p.m., hours after the second Franchisee Forum Call, Perri texted McLaren saying, "I'm 99% sure that the smash my trash patent is not their patent at all but Husmann's patent which they already have in Europe and are trying to get here for their sliding deck mechanism." JX 64 at '216.

Having grown confident that Smash did not have a patent, Perri decided to create a competing business with McLaren. From this point on, he was not seriously considering buying a franchise from Smash.

To reiterate, this decision reaches a different conclusion than the Injunction Decision about the timing of Perri's decision. The preliminary record made it reasonably likely that Perri had decided to launch a competing business one week earlier, on December 12, 2019. Injunction Decision, 2020 WL 4692287, at *5. The trial record showed that Perri was leaning against purchasing a Smash franchise on December 12, but he wanted to pin down whether Smash had a patent before making his decision.

19

Between December 12 and December 19, 2019, Perri investigated that issue further. By the afternoon of December 19, Perri was sufficiently confident—99%—about Smash's lack of a patent that he decided to pursue a competing business with McLaren. There remained a slight possibility—1%—that he was wrong about Smash lacking a patent, and if that turned out to be true, Perri would have reconsidered. Even then, it was unlikely that Perri would have purchased a Smash franchise, because he thought Haskin was being slippery about Smash's lack of a patent, and he viewed Smash's operation as disorganized and dysfunctional.

Having made his decision, Perri took a more active role in pursuing the competing business. On December 20, 2019, Perri emailed Packmat Maschinebau, GmbH ("Packmat"), a manufacturer of trucks that could be used to smash trash. That same day, Perri spoke with Epax Systems, Inc., a partner of a German company called Heinz Bergmann OHG ("Bergmann") which also manufactured trash-smashing machinery. Perri and McLaren discussed combining what the companies made to create a trash-smashing truck. That idea went nowhere, however, because Epax could not sell the products it made for Bergmann to third parties.

On December 21, 2019, McLaren and Perri discussed whether the trash-smashing truck they envisioned would be street legal. On December 24, Perri spoke with Packmat about becoming Dumpster Devil's exclusive supplier of trucks.

While he was pursuing these efforts to create a competing business, Perri continued to communicate with Fastlane and express interest in obtaining a Smash franchise. As noted, it remained theoretically possible that Perri might discover that Smash had a patent

20

and decide to buy a franchise, but Perri was 99% set on starting a new business. The main reason he continued to express interest in obtaining a Smash franchise was so that he could attend more Founder Calls to see if Haskin said anything else about a patent. In the meantime, Perri also wanted to attend Franchisee Forum Calls to pick up any tidbits he could about running a trash-smashing business.

## G. January 2020

With the start of the new year, Perri faced the looming problem of Discovery Day, scheduled for January 6 and 7, 2020. Fastlane had said that signing the NDA was a prerequisite to attending Discovery Day and had indicated that Smash would provide information about its "secret sauce." Perri could not risk attending because if he received confidential information protected by the NDA, then it would be dangerous to start a competing business. At that point, Smash would be able to assert a strong claim for breach of the NDA, creating significant litigation risk.

Perri had canceled his plane ticket three weeks earlier, but if he admitted that he was no longer interested in a franchise, then Fastlane might prevent him from participating in Founder Calls and Franchisee Forum Calls. Fastlane did not seem to be following any procedures designed to prevent people from attending the calls, but it was a possibility. It would have been easy for Fastlane to set up a new Zoom call and not give Perri the information. Perri wanted to keep participating in calls to confirm that Smash did not have a patent and to glean any kernels of additional information that might come his way.

Perri needed an excuse. The Fates provided one when his dog got sick and needed surgery. On January 3, 2020, he told Bode that he could not attend the Discovery Day

21

scheduled for January 6 and 7. During the injunction phase, the court was skeptical of Perri's excuse, which sounded like "the dog ate my homework." The trial record confirmed that sadly, the animal was suffering and needed care.

Perri asked Bode to sign him up for the next available Discovery Day. Bode obliged and scheduled Perri to attend on January 26 and 27, 2020. Perry was not planning on attending that Discovery Day either. If it turned out, contrary to his 99% expectation, that Smash had a patent, then he might, but what he really was doing was hedging his bets so he could continue participating in Founder Calls and Franchisee Forum Calls.

Perri attended his third Franchisee Forum Call on January 9, 2020. According to Perri's notes, the franchisee discussed

- the operating costs of the business, including payroll, rent, and gas;

- using Google Earth to identify dumpsters;

- how to pitch potential customers using projected savings;

- considerations when hiring a driver;

- the compensation structure that the franchisee used for drivers; and

- typical customer concerns, such as whether the extra weight would result in higher hauling and landfill costs.

JX 134 at '875–76. That was basically the same information Perri had obtained during his first two Franchisee Forum Calls, when he was legitimately interested in a franchise.

Perri participated in his fourth Franchisee Forum Call on January 17, 2020. According to Perri's notes, the franchisee discussed similar topics, including

- the operating costs of the business, including maintenance for the truck, its operating life of seven years, and overhead costs;

22

- using Zillow, Zoho, and LinkedIn to identify customers;

- how to pitch potential customers using projected savings; and

- considerations when hiring a driver.

*Id.* at '874–75. That call did not provide any meaningfully new information either.

Perri participated in a fifth Franchisee Forum Call on January 20, 2020. The franchisee largely repeated information that had been provided on earlier calls. *Id.* at '885.

The Founder Calls had the potential to reveal more about Smash's intellectual property rights, and Perri joined his second Founder Call on January 22, 2020. According to Perri's notes, Haskin discussed the following topics:

- Smash's number of franchises;

- Smash's goal of becoming the name-brand mobile trash compaction company by being first to market;

- some general ideas for improving the mobile trash compactor;

- the goal of garnering national accounts;

- progress on replacing Smash's current software with enterprise-level software;

- the benefits of Smash's route-based, trucking-company model;

- why Smash's franchise territories are "protected" rather than "exclusive"; and

- pricing for construction sites and how to pitch Smash's services.

*Id.* at '872–73.

As with the first Founder Call, Haskin's presentation was designed to convince prospects to buy a Smash franchise, but he did answer a question about "what is proprietary." *Id.* at '871. Haskin referred to "r&d, testing things[,] continuously looking at eq[uipment]." *Id.* Haskin did *not* say that there was any intellectual property protection for

23

the equipment. Haskin also referred to having trademarks in the United States and Canada. He then stressed that it was "more important to grab [market] share than to have [a] perfect design." *Id.* Perri thought Haskin was being "vague." *Id.*

In late January 2020, Bode informed Perri that a second group of prospective franchisees had expressed interest in the territories in Charlotte, North Carolina that Perri had identified. The group had committed to attend the next Discovery Day. Perri responded that he remained "[i]nterested in all 6 of the inner territories" in the Charlotte market. JX 114 at '132. Perri was not really interested in those territories. He planned to start a competing business with McLaren.

During January 2020, Perri and McLaren had been working with Packmat on specifications and pricing for equipment. On January 15, Packmat referred Perri to a chassis dealer for trucks. On January 21, Packmat emailed Perri a description of the equipment it could provide and offered to set up a demonstration.

On January 24, 2020, Perri told Fastlane that he would not attend the Discovery Day scheduled for January 26 and 27. He cited the other group's interest in the Charlotte territories as his reason for backing out. JX 116. He falsely claimed that he had "equal or higher interest in other territories," and that "it's best for me to wait to attend Discovery Day until you get closer to opening MD, VA, or CA." *Id.* He asked when Smash expected to offer franchises in those states. *Id.* By this time, Perri was dissembling because he had decided to pursue a competing business with McLaren.

Perri attended his third Founder Call on January 29, 2020. During the call, Haskin addressed

24

- aspects of fleet management, including maintenance costs, preventative maintenance, and the parts that often need to be replaced;

- using a hub-and-spoke model for maintenance, with one centralized independent contractor overseeing all of the trucks;

- operating a single shift, preferably at night, to maximize efficiency;

- using Huffspot to convert leads into customers; and

- his views on competitors.

JX 134 at '871–72. Those were all concepts that Perri had heard about before.

As with the earlier Founder Calls, Haskin's presentation was designed to convince prospects to buy a Smash franchise. This time, however, he fielded a question about what Smash's pending patent application covered and whether it was for a design patent or a utility patent. *Id.* at '871. Haskin said that the documents were public and that prospects "can look it up" to get the details. *Id.* He then cautioned that "[u]titlity patents are difficult to enforce, expensive to defend, [and that it] takes a long time to litigate." *Id.* He warned: "Don't buy a franchise [because] you think it is a monopoly or protected." *Id.*

Perri attended his sixth Franchisee Forum Call on January 30, 2020. Perri did not take notes, which suggests that he was not hearing anything knew.

Perri testified at trial that during January 2020, he continued to participate in Smash-sponsored calls to figure out whether Smash had a patent. Perri Tr. 249–50. That is literally true. But Perri was no longer seriously considering a Smash franchise. He wanted to make sure that Smash did not have a patent that could stop Dumpster Devil from competing with Smash. After the two Founders Calls in late January 2020, Perri could be all the more

confident that Smash did not have a patent and that Haskins was engaged in misleading handwaving about patent rights.

## H.    Perri And McLaren Reach A Deal With Packmat.

Toward the end of January 2020, Perri and McLaren prepared to travel to Canada to meet with representatives of Packmat. Perri created a presentation about Dumpster Devil that described a business closely resembling Smash. Dumpster Devil contemplated selling territories defined by population. It would establish regional offices to handle truck parking, drivers, and sales. It would use a hub-and-spoke model for maintenance and hiring an independent contractor to oversee repairs. Like Smash, Dumpster Devil would work with waste management companies as partners. Like Smash, Dumpster Devil would prioritize national accounts.

Perri's presentation also discussed the competition. When discussing Smash, Perri identified the manufacturer of Smash's truck and described the types of customers Smash targets, the capital required to start a Smash franchise, and how many franchises Smash had sold. The presentation also discussed Smash's marketing strategy and its effort to capture a first-mover advantage.

The principal difference between Dumpster Devil and Smash was Perri's desire to avoid the regulations surrounding franchises. Perri wanted to get as close to a franchise model as possible "without being a franchise." Perri Dep. II 302–03. To walk the line, Dumpster Devil would act as an exclusive supplier of equipment and as the licensor of the Dumpster Devil brand. Licensees would receive assistance with routing, maintenance, and

26

administration. Perri hoped that by not offering franchises, Dumpster Devil could beat competitors like Smash to the markets where a franchisor had to file for franchise approval.

At trial, Perri admitted that his presentation for Packmat included information he obtained from Smash. Perri Tr. 239. Perri legitimately obtained the vast majority of the Smash-related information on or before December 19, 2019, when he became 99% certain that he would not buy a Smash franchise. There was, however, one morsel of information that Perry obtained after December 19. A slide about competition that discussed Smash noted that the company did not yet have franchises in California or Maryland. JX 131 at 7. Perri had asked Fastlane about those states when he canceled his reservation to attend the end-of-January Discovery Day. JX 116.

After creating the presentation for Packmat, Perri asked Fastlane to notify him about future Discovery Days. Fastlane provided dates, but Perri never signed up, and he stopped responding to Fastlane's messages. *Id.* at 237.

On February 4, 2020, Perri and McLaren met with Packmat. Aided by their presentation, they convinced Packmat to become the exclusive supplier of equipment to Dumpster Devil.

The information Perri obtained from Smash played a role in Perri and McLaren's ability to secure the supplier agreement with Packmat. Perri and McLaren were experienced entrepreneurs with engineering degrees and business skills, but they lacked specific knowledge about the mobile trash compaction business. As Perri testified, much of Smash's business model might be "common sense if you're already in the hauling industry." *Id.* at 244. Perri and McLaren, however, were not in the hauling industry.

27

The information Perri obtained from Smash gave him an overview of the business model and related concepts so that he could speak convincingly enough to secure the Packmat deal. Perri thus benefited from the information he obtained from Smash. But that that fact comes with two qualifications.

First, without any of the information that Smash provided, Perri and McLaren eventually would have been able to present themselves as knowledgeable and credible industry players. It would have taken them several months to develop comparable knowledge on their own from publicly available sources and from talking to other industry players. It would not have happened in February 2020, but it would not have taken sixteen months.

Second, Perri obtained the vast majority of the information he used in the presentation legitimately while he was still considering a Smash franchise. The Smash Disclosure Document, the pitch book, the orientation call, the Unit Economics Call, the Unit Economics Worksheet provided the bulk of the information. He obtained additional information from his first Franchisee Forum Call and his first Founder Call, which took place before December 19, and his second Franchisee Forum Call, which took place on December 19. What Perri learned afterward was largely duplicative or confirmatory.

After securing the exclusive deal with Packmat, Perri attended two more calls with Smash. He attended his fourth Founder Call on February 5, 2020, and his seventh Franchisee Forum Call on February 6. According to Perri's notes, it was all the same information, and he learned nothing new. Those were the last two calls that Perri attended.

28

## I. Perri And McLaren Launch Dumpster Devil.

In early March 2020, Dumpster Devil's website went live. Perri and McLaren were open for business. They marked Dumpster Devil as a seller of mobile trash compaction equipment and advertised its "truck-mounted rotary compactor" as "disruptive technology" that is "second to none." JX 156.

The Dumpster Devil website devoted an entire page to comparing Dumpster Devil to Smash, which Perri and McLaren viewed as their biggest competitor. Perri Tr. 254. The website made claims designed to show that Dumpster Devil's truck and equipment was better than Smash's, including the following:

- Dumpster Devil's drum weighs one-half of a ton more than Smash's drum, leading to faster trash compaction.

- Dumpster Devil's drum has guards, while Smash's does not.

- Smash's truck supplier, Husmann, had sold less than fifty truck-mounted compactors.

- Smash's truck bed requires daily greasing, which lowers efficiency.

- Dumpster Devil's equipment is 10% more efficient than Smash's equipment.

- Dumpster Devil's truck does not require a special license to operate.

JX 157.

Perri and McLaren bought a Google AdWords advertisement for the name "Smash My Trash." When users in certain geographic areas searched for "Smash My Trash," the top listing was a paid advertisement for Dumpster Devil. When consumers clicked on the advertisement, the link took them to the webpage comparing Smash to Dumpster Devil.

29

The comparison page included detailed information attacking Smash's costs, efficiency, machinery, safety, and comfort. JX 157.

Dumpster Devil received multiple inquiries. Many were from individuals who were considering a Smash franchise. When contacting Dumpster Devil, individuals frequently mentioned their interest in Smash. Examples of those comments include:

- "I have been seriously considering an SMT franchise and ran across your website last night. I'd like to learn more about your option and equipment." JX 175.

- "I came across your business while doing research on 'Smash my Trash' franchise opportunities. I would like to see if your business opportunities are a good fit for my situation." JX 176.

- "I am exploring smash my trash but want to understand your business model." JX 165.

- "I have reached out to Smash my trash and will have my phone call next Monday. I came upon your website and am interested in what you have to offer." JX 182.

Packmat congratulated Perri and McLaren on their marketing strategy. JX 159.

Dumpster Devil sold two trucks to two parties that had previously participated in the Smash franchise process. Chris Novak went as far as attending Discovery Day on April 14 and 15. The next day, Novak told Fastlane that he would buying seven territories and was "looking forward to this business." JX 163 at '621. Then Novak saw Dumpster Devil's online advertisement. Within a week, Novak had scheduled a call with Perri, received a term sheet from Dumpster Devil, and decided against purchasing a Smash franchise.

**J.     Smash Files Suit.**

On April 20, 2020, Smash filed this action. The operative complaint asserted eight causes of action:

30

- Count I asserted a claim for breach of the NDA against Perri and Kanda Holdings;

- Count II asserted a claim for unjust enrichment against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count III asserted a claim for misappropriation of trade secrets in violation of DUTSA against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count IV asserted a claim for conversion of intangible property against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count V asserted a claim for unfair competition against Dumpster Devil;

- Count VI asserted a claim for fraud against Perri and Kanda Holdings;

- Count VII asserted a claim for deceptive trade practices in violation of DUDTPA against Dumpster Devil based on statements about Smash on the Dumpster Devil website; and

- Count VIII asserted a claim for trademark infringement against Dumpster Devil based on Dumpster Devil's purchase of "Smash My Trash" from Google AdWords and its use of the mark in Dumpster Devil's marketing campaign.

Smash moved for expedited proceedings in preparation for a hearing on an application for preliminary injunction. Counsel acted constructively by agreeing on a schedule culminating in an injunction hearing. The parties conducted expedited discovery in anticipation of that hearing.

On July 16, 2020, the court heard oral argument on Smash's motion for preliminary injunction. The relief that Smash sought would have shut down Dumpster Devil's business by preventing the defendants from "(1) using and/or disclosing the Confidential Information; (2) using and/or disclosing [Smash's] confidential and proprietary information; (3) using and/or advertising using [Smash's] intellectual property, including their trademarks; and (4) competing with [Smash]." Dkt. 20 at 24.

31

Obtaining a business-killing injunction on a preliminary record was a big ask, and the court declined to grant it. On August 13, 2020, the court issued a decision that granted Smash more limited relief. The court's ruling enjoined Dumpster Devil "from making statements about (i) Smash's drum lacking guards, (ii) the Smash truck's slides needing daily greasing, and (iii) the Dumpster Devil truck weighing less than 26,000 pounds and not requiring a commercial license." Injunction Decision, 2020 WL 4692287, at *20. The Injunction Decision denied the other aspects of Smash's application on various grounds.

After the Injunction Decision, the litigation continued on a non-expedited track. Trial was scheduled for November 2022.

In June 2021, Smash filed an amended pleading that withdrew its claims for conversion and trademark infringement. In October 2022, one month before trial, Smash informed the court and the defendants that it was "electing not to proceed to trial on Count I (Breach of Contract), Count II (Unjust Enrichment), Count III (Misappropriation of Trade Secrets), and Count IV (Unfair Competition)." PTO at 2.

As a result of these tactical decisions, Smash proceeded to trial on only two claims: fraud and violations of DUDTPA. McLaren was not named as a defendant on either claim.

Trial took place on November 14 and 15, 2022. Haskin, Perri, and McLaren testified live as fact witnesses. Smash called Chuck Modell as an expert witness on franchising and Jay Cunningham as an expert on damages. The defendants called Michael Seid as an expert on franchising and R. Christopher Rosenthal as an expert on damages. After trial, the court entered judgment in favor of McLaren.

## II.    LEGAL ANALYSIS

Smash sought to prove at trial that Perri fraudulently induced Smash into revealing information about its business by falsely representing that he was interested in purchasing a Smash franchise. Smash also sought to prove that Dumpster Devil engaged in deceptive trade practices by making false statements about Smash when marketing its business. Smash is not entitled to relief on either claim.

### A.    Fraud

Smash first sought to prove that Perri committed fraud. Smash's common law fraud claim is preempted by DUTSA. Were it not, Smash failed to prove that Perri's fraud caused Smash to suffer any non-nominal damages. Judgment will be entered in favor of Perri on the fraud claim.

### 1.    DUTSA Preemption

Smash cannot prevail on its claim for fraud because DUTSA preempts the claim. Section 2007 of DUTSA provides generally for preemption of common law causes of action based on the same underlying facts as a DUTSA claim. The operative provision states: "Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 *Del. C.* § 2007(a) (the "Preemption Provision"). Subsection (b) preserves certain claims by stating that the chapter does not effect:

> (1) Contractual remedies, whether or not based upon misappropriation of a trade secret;
>
> (2) Other civil remedies that are not based upon misappropriation of a trade secret; or

> (3) Criminal remedies, whether or not based upon misappropriation of a trade secret.

*Id.* § 2007(b) (the "Preservation Provision"). Under the Preemption Provision, a common law claim cannot proceed unless it falls under one of the exceptions enumerated in the Preservation Provision.[3]

Under Delaware law, DUTSA establishes a single, unified, statutory scheme for claims involving misappropriation of information. Unless expressly preserved by the Preservation Provision, DUTSA preempts common law causes of action involving misappropriation of information. It does not matter whether or not the information at issue qualifies as a trade secret under DUTSA. *Alarm.com Hldgs., Inc. v. ABS Cap. P'rs Inc.*,

---

[3] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002)  One of those exceptions is for "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret." 6 *Del. C.* § 2007(b)(1). Smash asserted a claim for breach of an NDA that Perri signed. With the benefit of hindsight, that contractual claim appears to have provided Smash with its best path to recovery. During the injunction phase, Smash contended that its claims against the defendants—including its contractual claim—were sufficiently strong to warrant the issuance of a preliminary injunction that would have stopped Dumpster Devil's business and destroyed the firm. That type of injunction effectively constitutes final relief, because the destruction of a business cannot be undone after trial. To obtain such an injunction, Smash's claims needed to be particularly strong, which they were not. For purposes of the claim under the NDA, the court ruled on the preliminary record presented at the injunction stage that Smash had not made a sufficient showing that Perri received Confidential Information, as defined in the NDA, as opposed to information that Smash either made available to the public, including in the Smash Disclosure Document, or provided to individuals who expressed interest in a franchise  but had not yet executed an NDA. Injunction Decision, 2020 WL 4692287, at *9, *13. That analysis did not mean that Smash could not prove a breach of contract at trial, where Smash would be seeking either damages or an injunction based on a full evidentiary record. In the pre-trial order, however, Smash dropped its claim for breach of the NDA. That claim is therefore no longer at issue.

2018 WL 3006118, at *11 (Del. Ch. June 15, 2018) ("Preemption applies regardless of whether the information would ultimately rise to the level of a trade secret."), *aff'd*, 204 A.3d 113 (Del. 2019). If the information qualifies as a trade secret under DUTSA, then the plaintiff may have a claim under DUTSA. If the information does not qualify as a trade secret under DUTSA, then the plaintiff has no claim under DUTSA or any common law source, unless the claim fits within one of the three exceptions in the Preservation Provision.[4]

DUTSA's preemption of competing common law claims includes claims for fraud. By its terms, the Preemption Provision displaces competing claims "providing civil remedies for misappropriation of a trade secret." 6 *Del. C.* § 2007(a). DUTSA's definition of "[m]isappropriation" includes "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* §

---

[4] *iBio, Inc. v. Fraunhofer USA, Inc.*, 2020 WL 5745541, at *13 (Del. Ch. Sept. 25, 2020). Delaware's approach reflects the majority view. A minority of jurisdictions reason that their versions of the Uniform Trade Secret Act only apply to information that meets the definition of a trade secret. Those versions of the act include analogues to the Preemption Provision, and the decisions reason that if the information does not qualify as a trade secret, then the Preemption Provision does not apply either. Under that approach, if the information does not qualify as a trade secret, then the plaintiff is "free to proceed on whatever state tort law claim the plaintiff can make out." *Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, 2017 WL 1842899, at *13 (Del. Super. Ct. Apr. 20, 2017). The minority view creates the counterintuitive outcome in which a plaintiff can invoke a more varied set of causes of action for information that does not qualify as a trade secret than a party can for information that qualifies as a trade secret. It also renders superfluous the language in the Preservation Provision which specifies that the covered claims are preserved "whether or not based upon misappropriation of a trade secret." 6 *Del. C.* § 2007(b). Delaware follows the majority view, which represents the more sound approach.

2001(2). DUTSA defines "[t]rade secret" to mean "information, including a formula, pattern, compilation, program, device, method, technique or process" that both (i) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (ii) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 2001(4).

As noted, the Preemption Provision preempts claims that involve the misappropriation of information that falls short of a trade secret. Reframed in those terms, the Preemption Provision displaces competing claims involving the acquisition of information, including a formula, pattern, compilation, program, device, method, technique or process, belonging to another, by a person who knows or has reason to know that the information was acquired by improper means.

A claim that a person acquired information by fraud falls within the scope of the Preemption Provision. *Truinject Corp. v. Nestlé Skin Health, S.A.*, 2020 WL 70981, at *8 (D. Del. Jan. 7, 2020) ("[A] fraud claim based on the assertion that a defendant made misrepresentations in order to induce the plaintiff to disclose its confidential information is preempted by DUTSA."); *Alarm.com*, 2018 WL 3006118, at *10 (Del. Ch. June 15, 2018) ("A claim for common law misappropriation, by contrast, has the same scope and parameters as a claim for misappropriation under DUTSA."). A non-DUTSA claim is preempted if it involves the acquisition of information by wrongful means and is "based on the same alleged wrongful conduct" that would support a DUTSA claim if the information qualified as a trade secret. *Savor*, 812 A.2d at 898; *250ok, Inc. v. Message Sys.*,

36

2021 WL 225874, at * 5 (Del. Ch. Jan. 22, 2021) (considering whether the claim was "based on the same wrongdoing" as a potential DUTSA claim). "A common law claim is said to be grounded in the same facts as a trade secrets claim if the same facts are used to establish all the elements of both claims." *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *4 (Del. Ch. June 17, 2011) (cleaned up).

Applied to the facts of this case, the Preemption Provision forecloses Smash's fraud claim. Smash contends that Perri committed fraud by mispresenting his intentions to purchase a Smash franchise. According to Smash, Perri was able to obtain information about Smash and its business by participating in Founder Calls and Franchisee Forum calls. Smash's fraud claim asserts that Perri obtained information (the contents of the calls) by improper means (fraud). The conduct giving rise to the fraud claim is precisely the same conduct that would give rise to a DUTSA claim if the information in question qualified as a trade secret. DUTSA therefore preempts the fraud claim.

To avoid this result, Smash argues that Perri fraudulently obtained training, not information. Training is merely one way to convey information. Merriam-Webster defines "training" as "the act, process, or method of one that trains" and "the skill, knowledge, or experience acquired by one that trains." *Training*, Merriam-Webster, https://www.merriam-webster.com/dictionary/training (last visited June 21, 2023). The American Heritage Dictionary similarly defines "training" as "the process or routine of one who trains." *Training*, Am. Heritage Dictionary Eng. Language, https://www.ahdictionary.com/word/search.html?q=training (last visited June 21, 2023). The Cambridge Dictionary defines "training" to mean "the process of learning the skills

37

you need to do a particular job or activity." *Training*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/training (last visited June 21, 2023). Dictionary definitions thus show that training is a process through which one acquires information and develops knowledge, skills, or experience to perform an activity. Put another way, training means a targeted conveyance of information to develop proficiency at a given task.

Smash also argues that the court previously held in the Injunction Decision that the Preemption Provision did not apply to Smash's fraud claim. The parties briefed the preemption issue at the preliminary injunction phase of this litigation. *See* Dkt. 89 at 49; Dkt. 104 at 24–25. The Injunction Decision, however, only addressed whether DUTSA preempted Smash's since-abandoned claim for conversion. *See* 2020 WL 4692287, at *15 ("Under DUTSA, Smash's conversion claim is preempted and cannot be asserted."). The court's focus on whether DUTSA preempted Smash's conversion claim mirrored the parties' emphasis on that issue. The parties did not place similar emphasis on preemption of Smash's fraud claim. *Compare* Dkt. 89 at 43–45, *and* Dkt. 104 at 21–23, *with* Dkt. 89 at 49, *and* Dkt. 104 at 24–25. The Injunction Decision did not discuss whether the Preemption Provision or any other DUTSA provision affected Smash's fraud claim. *See* 2020 WL 4692287, at *16–17. The Injunction Decision's silence does not mean that the court ruled against preemption. That question remained open and this decision, with the benefit of further argument by the parties, now holds that Smash's fraud claim is preempted.

The Preemption Provision bars Smash's fraud claim. Judgment will be entered for Perri on that basis.

## 2. The Failure To Prove Causally Related Damages

Assuming that the Preemption Provision did not apply, Smash's claim for fraud would still fail. To prevail on a claim for fraud, a plaintiff must prove (i) a false representation, (ii) made with scienter, (iii) intended to induce action, (iv) on which the plaintiff reasonably relied, and (v) resulting in causally related damages. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Assuming for purposes of analysis that Smash proved a false representation, scienter, an intent to induce action, and reliance, Smash failed to prove casually related damages.

Although it is not necessary to analyze the first four elements of a fraud claim that fails on the final element, addressing the first element is helpful in framing what Smash needed to prove to show causally related damages. To establish the first element of a common law fraud claim, a plaintiff must prove "a false representation, usually one of fact, made by the defendant." *Id.* The factual representation can be explicit or implicit. *See In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096 (Del. Ch. Nov. 24, 2003), *aff'd*, 2004 WL 835879 (Del. Apr. 14, 2004) (TABLE).

Smash proved that Perri misrepresented his intention to purchase a franchise by continuing to participate in Smash's recruitment process after December 19, 2019. As of that date, Perri had become 99% certain that Smash did not have a patent, and he was 100% certain that he was not going to purchase a Smash franchise. Perri had been interested in Smash primarily because of its claims about patent protection and high margins. By the

39

afternoon of December 19, Perri had been warned against franchises by McLaren, was unimpressed by Smash's organization, thought Haskin was blowing smoke at prospects to sell them franchises, and was 99% certain that Smash did not have a patent. After December 19, Perri no longer had any intention of purchasing a Smash franchise, and he kept participating in Founder Calls and Franchisee Forum Calls because there was still a risk, however small, that Smash did have a patent that it could use to block a competing business. If Smash had a patent, then the threat was existential, so Perri wanted to make sure that he and McLaren did not face that risk.

Despite having made up his mind on the afternoon of December 19, 2019, Perri continued to represent to Smash, both explicitly and implicitly, that he was interested in a franchise. Perri made that representation in the following ways:

- He participated in Franchisee Forum Calls January 9, 17, 20, and 30, 2020, and February 6, 2020, which were intended for individuals interested in purchasing a franchise.

- He participated in Founder Calls on January 22 and 29, 2020, and February 5, 2020, which were intended for individuals interested in purchasing a franchise.

- On January 3, 2020, after cancelling his attendance at Discovery Day on January 6 and 7, he signed up to attend Discovery Day on January 26 and 27, as if he remained interested in purchasing a franchise.

- He told Fastlane on January 22, 2020, that he was interested in purchasing six territories in Charlotte, North Carolina.

- He told Fastlane on January 24, 2020, that he would be interested in purchasing territories in Virginia, Maryland, and California once Smash opened operations in those states.

Through those statements and actions, Perri represented to Smash that he intended to purchase a franchise. Perri knew that his representations were false.

40

For purposes of the final element of a fraud claim, the false representation must cause harm. *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 32 (Del. Ch. 2009). The necessary causal connection has two dimensions. First, the misrepresentation must be a factual cause of the harm—generally called a but-for cause—meaning that the harm would not have occurred but for the misrepresentation. *Id.* Second, the misrepresentation must be the legal cause of the harm—generally called the proximate cause—meaning that the misrepresentation must be a sufficiently significant cause of the harm to impose liability. Restatement (Second) of Torts, § 548A, cmt. a–b (Am. L. Inst. 1977), Westlaw (database updated May 2023). "The second limitation recognizes that the harm flowing from an event in the but-for sense at some point becomes too attenuated to give rise to liability. Our law will not award damages for a kingdom when the wrong concerns a two-penny nail." *NACCO*, 997 A.2d at 32.

As a remedy, Smash seeks damages for lost profits stemming from a supposed sixteen-month head start the defendants enjoyed because of Perri's misrepresentations. Smash theorizes that but for Perri's improper actions, Perri and McLaren would have needed the same amount of time to develop Dumpster Devil that it took Haskin to create the franchise side of Smash's business. Smash claims that the sixteen-month head start resulted in potential Smash franchisees buying Dumpster Devil equipment instead. Smash's damages expert, Jay Cunningham, opined that five Dumpster Devil customers would have purchased Smash franchises if Dumpster Devil had not been competing with Smash. JX 252. Cunningham calculated that the present value of Smash's lost profits from those franchises resulted in damages totaling $3,427,091. *Id.*

41

Smash failed to prove that Perri's fraudulent representations caused those damages. Smash did not clear either of the hurdles of but-for causation and legal causation.

### a. The First But-For Cause Problem: No Additional Information That Made A Difference

Smash grounds its theory of but-for causation on the assertion that if Perri did not misrepresent his interest in acquiring a franchise, Smash would have cut off his access to valuable information.[5] Smash contends that by virtue of his fraudulent misrepresentations, Perri gained information that enabled him to start his business sixteen months earlier than otherwise would have been possible.

The first but-for problem with that theory concerns the information Perri obtained by fraud. Smash acts as if all the information that Perri acquired was the product of fraud, but before his decision on the afternoon of December 19, 2019, Perri was not engaging in fraud, and during that period he obtained significant amounts of information from Smash. For Perri's misrepresentations to be a but-for cause of harm, his misrepresentations had to induce Smash to provide him with additional information beyond what he received while participating legitimately in Smash's sale process. If Perri could have done everything he did with Dumpster Devil based on the information that he legitimately received, then Smash's fraud claim fails for lack of causation.

---

[5] At trial, Haskin testified that a key aspect of the sales process "was really creating a funnel" that would keep prospective franchisees "constantly . . . in motion. They were moving one way or the other. They were either moving, ultimately, to committing to a discovery day, or we were registering these dates that would hold people up." Haskin Tr. 23.

Smash failed to prove that Perri acquired information after December 19, 2019 that provided him with meaningful assistance in starting Dumpster Devil. By the afternoon of December 19, Perri had

- participated in a call with Bode where he received information concerning Smash's history and current status of the business;

- attended the Unit Economics Call where he learned about Smash's start-up costs and operating expenses;

- received a pitch deck, the Unit Economics Worksheet, and the Smash Disclosure Document;

- participated in a Founder Call on December 18, 2019; and

- participated in Franchisee Forum Calls on December 12 and 19, 2019.

These sources of information provided Perri with considerable insight into Smash's business.

The Smash Disclosure Document alone provided Perri with much of the information he obtained. From that document, he learned

- the initial investment required for a franchise, broken down by line item;

- extensive disclosures about a franchise's expected financial performance;

- the identity of the manufacturer of Smash's equipment;

- the estimated size of a Smash franchise territory by population;

- the number of trucks a franchisee would need to purchase to service the number of territories owned;

- the number of trucks a franchisee would need to purchase based on the volume of business conducted; and

- the number of extant Smash franchises.

*See* JX 4. Perri obtained additional information during his orientation call and from the pitch deck, the Unit Economics Worksheet, and the Unit Economics Call. Smash does not consider any of that information to be confidential. *See* Haskin Tr. 111; Haskin Dep. 104.

Perri received even more information during the first Franchisee Forum Call on December 12, 2019, the first Founder Call on December 18, and the second Franchisee Forum Call on December 19. During these calls, Smash's franchisees and Haskin provided significant amounts of information because Smash was a new franchisor and had to sell prospects on its business model and bright future. A known franchisor like McDonald's does not have to provide the same level of information up front, but Smash was in a different position. Modell Tr. 375–76.

Perri received all of this valuable information legitimately, before he made the decision to start a competing trash-compaction business and before he began misrepresenting his interest in acquiring a Smash franchise. Smash could not point to any additional information that Perri received after December 19, 2019 that made a difference for the launch of Dumpster Devil.

To be sure, Perri continued to participate in calls and take notes, but that does not mean the calls gave him any new information that carried significance for launching Dumpster Devil. The Founder Calls and Franchisee Forum Calls were primarily sales efforts designed to provide enough information to convince prospects to go deeper into the franchising process by attending Discovery Day. Haskin and the franchisees were providing more information than an established franchisor would, but they were not providing materially more or different information across a series of calls.

Smash failed to prove that Perri's misrepresentations generated materially different information than what he received when participating legitimately in Smash's process. Smash therefore failed to prove that Perri's misrepresentations were a but-for cause of the damages that Smash sought to recover.

### b. The Second But-For Cause Problem: No Connection To A Sixteen-Month Head Start

Smash's theory of causally related damages faces a second but-for causation problem: Any additional information Perri procured by fraud after December 19, 2019, had to be a but-for cause of a sixteen-month head start. Smash failed to prove that Perri's misrepresentations caused him to receive information that allowed him to launch Dumpster Devil sixteen months earlier than he otherwise could have. Assuming Perri received additional material information after December 19, Perri did not receive the type of information that would affect his timeline for launch.

As noted in the prior section, the Founder Calls and Franchisee Forum Calls were sales efforts. Neither was designed to teach a prospective franchisee how to launch and operate a franchise. Smash only provided that information and training *after* a franchisee had attended Discovery Day and committed to purchasing a Smash franchise.

The Smash Disclosure Document describes the extensive training that Smash provides *after* a franchisee has committed contractually to purchase a franchise. The curriculum contemplates sixty-four hours of training on

- establishing the business (four hours);
- developing a plan (four hours);

45

- understanding the equipment (ten hours);

- marketing and business development (sixteen hours);

- operations and management (sixteen hours);

- administrative (eight hours); and

- executing your plan (six hours).

JX 4 at 19–21. Thirty hours of the mandatory training must be completed as on-the-job training. *See id.*

Smash does not view the information that franchisees receive in Founder Calls and Franchisee Forum Calls as part of its training program. The training program is different.

Perri never received any of the training that Smash requires before a franchisee can launch and operate a Smash franchise. After December 19, 2019, Perri attended three additional Founder Calls and five additional Franchisee Forum Calls for a total of approximately eight hours of generally repetitive sales efforts. Those calls came nowhere close to the training that Smash views as necessary to launch and operate a franchise. It would not matter how many Founder Calls and Franchisee Forum Calls that Perri listened to; they were not providing the information necessary to start a franchise, let alone launch a competing business.

The Founder Calls and the Franchisee Forum Calls gave Perri a general overview of the mobile trash-smashing business. As discussed in the Factual Background, that information did provide Perri with some advantages. Most notably, it enabled Perri and McLaren to secure a deal with Packmat in February 2020. Without that information, it would have taken Perri and McLaren longer to establish that relationship, but it would not

46

have taken them sixteen months. The information from the Founder Calls and Franchisee Forum Calls that Perri attended while considering a franchise, along with the information in the pitch deck, the Smash Disclosure Document, and the initial calls with Fastlane, were enough to accelerate the process for launching Dumpster Devil. Perri obtained that information legitimately.

The information that Perri obtained after December 19, 2019, likely accelerated the launch of Dumpster Devil by a month or two. It did not cause the launch to accelerate by sixteen months.

### c. The Proximate Causation Problem: The Lack Of A Sufficient Connection To Lose Franchises

In addition to problems with but-for causation, Smash's theory of lost franchisees fell short on the issue of proximate causation. To reiterate, proximate causation considers how close the relationship is between the causal factor and the resulting damages. If the causal factor is too attenuated, then a court can decline to award damages because of a lack of proximate cause.

Smash failed to prove that Dumpster Devil's existence in the market was a proximate cause of five lost franchisees. Under Smash's franchising system, a prospect can go through the entire sale process, including attending Discovery Day, and then decide not to buy a franchise. During the due diligence process, a customer often will evaluate other options simultaneously. Seid Tr. 334; Modell Tr. 432–33. Haskin agreed at trial that prospective franchisees frequently speak with competitors while exploring whether to purchase a Smash franchise. Haskin Tr. 133.

47

Some individuals who explore purchasing a franchise decide that franchising is not for them. As the defendants' franchising expert explained, serial entrepreneurs typically fit poorly in a franchise model because they want to be the ones making decisions. Seid Tr. 338. On the other hand, "[v]eterans make incredible franchisees because we're used to following orders." *Id.* It would not be unusual for an entrepreneurial-minded prospect to explore a franchise, then decide to start their own business instead.

Smash introduced some evidence which suggested that Dumpster Devil's presence in the market was a factor that contributed to some prospective franchisees not purchasing a Smash franchise. But the fact that some individuals ended up purchasing equipment from Dumpster Devil does not mean that they otherwise would have purchased a Smash franchise. They could have purchased a franchise from another mobile trash compaction franchisor, opted for a different type of franchise entirely, or started their own business without buying a franchise and without buying equipment from Dumpster Devil. The evidence that Smash presented did not establish a sufficiently persuasive causal connection between Perri's misrepresentations, an earlier start for Dumpster Devil, and lost Smash franchises. The causal linkage is too attenuated, meaning that Smash failed to satisfy the requirement of proximate cause.

Perri's misrepresentations did have some causal consequences. By misrepresenting his interest in acquiring a Smash franchise, Perri was able to remain in Smash's onboarding funnel and keep attending Franchisee Forum Calls and Founder Calls. Smash itself admits, however, that "[t]he time and expense spent marketing to Perri is an insignificant cost." Dkt. 303 at 54.

48

### d. The Fraud Claim Fails In Its Own Right.

This decision has held that DUTSA preempted the fraud claim. Assuming preemption did not apply, the fraud claim failed in its own right. After December 19, 2019, Perri engaged in deceptive conduct, but his actions did not cause Smash to give Perri additional or different material information that accelerated Dumpster Devil's launch by sixteen months and led to the loss of five franchises. Perri already had the information that he needed to start Dumpster Devil, and the information he received after December 19 was predominantly repetitive or confirmatory. The information he obtained after December 19 did not accelerate the launch of Dumpster Devil by sixteen months, and it did not proximately cause the loss of five franchises. If DUTSA did not preempt the fraud claim, then Smash still could not have recovered the damages it sought to prove at trial.

## B. Deceptive Trade Practices

In the second claim that Smash pursued at trial, Smash sought to prove that Dumpster Devil made false representations on its website when it compared Smash's equipment to its equipment, violating DUDTPA. As a remedy, Smash seeks (i) a permanent injunction barring the defendants from making disparaging statements about Smash and (ii) treble damages, plus attorneys' fees and costs. Dkt. 323 at 67. Smash proved violations of DUDTPA, but not an entitlement to its chosen remedies.

In 1965, the Delaware General Assembly passed DUDTPA and its companion bill, the Consumer Fraud Act, to better protect the interests of both consumers and businesses. *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 66 (Del. 1993). The General Assembly intended to provide businesses with a remedy for the "unreasonable interference with the

49

promotion and conduct of another person's business." *Id.* at 67. In *Grand Ventures*, the Delaware Supreme Court further elaborated on the purpose of DUDTPA:

> [DUDTPA] is based on the Uniform Deceptive Trade Practices Act of 1964, which the General Assembly adopted in its entirety. The purpose of the Uniform Act is to bring state laws up to date by removing undue restrictions on the common law action for deceptive trade practices. As examples of the common law restrictions deleted, the Act specifically makes unnecessary proof of competition between the parties, monetary damages or intent to deceive. Except where the statutory provision and the common law conflict, the Act suggests no intent to replace the common law.

*Id.* (internal citations omitted). In its original form, DUDTPA solely "provided injunctive relief to 'a person likely to be damaged by a deceptive trade practice of another.'" *Id.* at 68 (quoting 6 *Del. C.* § 2533(a)). In 1970, the General Assembly added a provision permitting courts to treble common law or statutory damages. *Id.*; *see* 6 *Del. C.* §2533(c).

DUDTPA seeks "to address unfair competition issues through relaxed pleading and proof standards." Olha N.M. Rybakoff, *An Overview of Consumer Protection and Fair Trade Regulation in Delaware*, 8 Del. L. Rev. 63, 67 (2005). DUDTPA does not "define 'unfair,' 'deceptive' or 'fraudulent' acts or practices." *Id.* at 71. DUDTPA states only "that unfair or deceptive acts or practices in commerce are unlawful, thus leaving it to the court in each particular instance to determine whether there has been a violation." *Id.*

Under DUDTPA, "[a] person engages in a deceptive trade practice" if he

(1)     Passes off goods or services as those of another;

(2)     Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)     Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4)     Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5)     Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6)     Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7)     Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8)     Disparages the goods, services, or business of another by false or misleading representation of fact;

(9)     Advertises goods or services with intent not to sell them as advertised;

(10)    Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11)    Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12)    Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

6 *Del. C.* § 2532(a).

DUDTPA does not specify a requisite degree of fault. It does not say, for example, that a party only violates DUDTPA if it engages in an enumerated practice negligently, or recklessly, or willfully. "[T]he enumerated practices are *per se* deceptive." Rybakoff, *supra*, at 72.

The text of DUDTPA necessarily leads to that interpretation. Section 2534(e) of DUDTPA implies that a violation can exist even if a person did not know or have reason to know that the conduct was prohibited. That section states:

> If a court of competent jurisdiction finds that any person has wilfully violated this subchapter, upon petition to the court by the Attorney General in the original complaint or at any time following the court's finding of a wilful violation, the person shall forfeit and pay to the State a civil penalty of not more than $10,000 for each violation. For purposes of this subchapter, a wilful violation occurs when the person committing the violation knew or should have known that the conduct was of the nature prohibited by this subchapter.

*Id.* § 2533(e). By stating that a wilful violation triggers this additional penalty, the statute implies that non-wilful conduct can support a violation. The fact that wilful conduct is defined to include conduct that the person "should have known . . . was of the nature prohibited by this subchapter" suggests that an innocent violation is still a violation.

Another section of DUDTPA points in the same direction. It states that DUDTPA does not apply to "[p]ublishers, broadcasters, printers, or other persons engaged in the dissemination of information or reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." *Id.* § 2534(a)(2). The fact that DUDTPA creates an express exception for the identified classes of persons when they act "without knowledge of [the material's] deceptive character" indicates that other classes of persons do violate DUDTPA even if they act without knowledge the material's deceptive character.

### 1. The Claimed Violations

To succeed in a claim under DUDTPA, a plaintiff need only prove that the defendant's conduct constitutes one of the enumerated categories of acts. *See id.* § 2532(b). Smash relies on the eighth category: an act that "disparages the goods, services, or business of another by false or misleading representation of fact." *Id.* § 2532(a)(8). The remedy that Smash can obtain, however, is affected by whether Dumpster Devil acted wilfully. Whether Perri or McLaren had a good faith belief that their statements were accurate therefore remains important.

#### a. Drum Guards

Smash proved that Dumpster Devil violated DUDTPA by falsely claiming that the drums on Smash's trucks lack guards. Dumpster Devil proved that it had a good faith albeit erroneous belief that the statement was correct.

On a webpage that compared its trucks with Smash's trucks, Dumpster Devil stated, "Smash My Trash's drum does not have guards, which means a distracted or careless operator could cost you thousands of dollars." JX 157. In the Injunction Decision, based on the record presented at that point, the court found that Smash had shown a reasonable probability of success on the merits of its claim that this statement was false. 2020 WL 4692287, at *17. The court issued a preliminary injunction barring Dumpster Devil from making the statement. *Id.* at *20.

At trial, Smash successfully proved that its drums had guards. Haskin Tr. 70; JX 217. As early as November 6, 2019, an Oklahoma City-based Smash franchisee posted pictures on Facebook showing that his drum had guards. JX 217. Haskin testified that

"[e]very single truck from that point forward through today receives the guards. It is not an option. It is a standard piece of safety equipment." Haskin Tr. 71. As early as December 11, Smash's official Twitter page also depicted drums with guards. JX 222.

By showing that Dumpster Devil's statement about drum guards was incorrect, Smash showed that Dumpster Devil violated DUDTPA. But Dumpster Devil showed that it had a reasonable basis for believing that its statement was true. The pitch deck that Smash provided to Perri included pictures of Smash trucks with drums that lacked guards. JX 9. Other pictures that Smash posted on social media also showed Smash's trucks with drums that lacked guards. JX 217. At trial, Perri testified that he "didn't have an inkling" that Smash's trucks had guards. Perri Tr. 207.

A dispute of fact existed about whether Haskin stated during the Founder Calls that Smash's trucks had guards. Haskin said he did. Haskin Tr. 71–73. Perri said that he didn't. Perri Tr. 207–08. Both witnesses had their credibility impeached at trial. Perri, however, testified credibly that he quickly came to doubt many of Haskin's claims. Assuming for the sake of argument that Haskin stated during the Founder Calls that all of Smash's drums had guards, Perri could legitimately question the veracity of that statement. Dumpster Devil was entitled to rely on the images that Smash provided in the Smash Disclosure Document and on social media.

Smash proved a violation of DUDTPA based on Dumpster Devil's statement about a lack of guards. That statement, however, was made in good faith.

54

### b.  Daily Greasing

Smash also proved that Dumpster Devil violated DUDTPA by falsely claiming that the sliding rail on the compaction unit of Smash trucks requires daily greasing. JX 157. Dumpster Devil again proved that it had a good faith albeit erroneous belief that the statement was correct.

On its comparison webpage, Dumpster Devil stated, "[Smash's] bed requires daily greasing and periodic maintenance, which further lowers your efficiency, and adds to your costs and potential downtime." *Id.* In the Injunction Decision, based on the record presented at that point, the court found that Smash had shown a reasonable probability of success on the merits of its claim that this statement was false. 2020 WL 4692287, at *17. The court issued a preliminary injunction barring Dumpster Devil from making the statement. *Id.* at *20.

At trial, Smash proved that, as a general rule, its trucks do not require daily greasing. Haskin testified that Smash trucks require weekly greasing and that Smash franchisees are instructed accordingly both orally and through training materials. Haskin Tr. 75–76; *see* JX 236 at '076–80. Smash's training materials provide greasing guidance: "[R]ails on which the sled moves need to be greased to ensure smooth operation. Typically this is done once per week, following heavy rains, or as needed based on the movement of the sled." JX 236 at '077. The training materials also provide a checklist for drivers to complete both before a after a trip. *Id.* Neither checklist includes greasing the sled. *See id.* The evidence at trial demonstrated that although certain conditions may call for daily greasing, Smash's trucks do not *require* daily greasing.

By showing that Dumpster Devil's statement about daily greasing was incorrect, Smash showed that Dumpster Devil violated DUDTPA. But Dumpster Devil again showed that it had a reasonable basis for believing that its statement was true. During Franchisee Forum Calls, an existing franchisee named John Ramsier advised the prospective franchisees that greasing the sled area daily was "best practice." Ramsier Dep. 29. Ramsier operates in Florida, and he explained that climate has a large impact on the frequency of necessary maintenance. *Id.* at 32. Florida's humidity and heavy rain necessitated daily greasing, and Ramsier assumed that all other franchises greased their sleds with the same frequency. *Id.* at 32–33. Smash also advised another franchisee that drivers "have small tasks such as greasing the sled, checking the bolts, etc [sic] that they should be checking and managing daily." JX 196.

Smash proved a violation of DUDTPA based on Dumpster Devil's statement about daily greasing. That statement, however, was made in good faith.

### c. Truck Weight

In contrast to the two prior statements, Smash failed to prove at trial that Dumpster Devil violated DUDTPA by falsely claiming that both its truck weighed less than 26,000 pounds. In the Injunction Decision, the court found that Smash had demonstrated a reasonable likelihood of success on the merits for purposes this statement. 2020 WL 4692287, at *18. The court issued a preliminary injunction barring Dumpster Devil from making the statement. *Id.* at *20.

After the Injunction Decision, Dumpster Devil demonstrated to Smash's satisfaction that it had trucks in service that weighed less than the 26,000-pound threshold, and the parties stipulated to an order vacating that portion of the Injunction Decision. Dkt. 146.

At trial, Smash did not introduce evidence indicating that Dumpster Devil's trucks now weigh more than 26,000 pounds. Smash thus failed to prove a violation of DUDTPA based on this claim.

### 2. Smash's Request For Permanent Injunctive Relief

As a remedy for the violations that Smash proved at trial, Smash asks the court to convert its preliminary injunction into a permanent injunction. DUDTPA allows a court to "grant an injunction . . . under the principles of equity and on terms that the court considers reasonable" without "[p]roof of monetary damage, loss of profits, or intent to deceive." *Id.* § 2533(a). Injunctive relief is "intended to provide a remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." *Del. Solid Waste Auth. v. E. Shore Env't, Inc.*, 2002 WL 537691, at *4 (Del. Ch. Mar. 28, 2002).

Injunctive relief under DUDTPA is warranted where a plaintiff demonstrates that a defendant has engaged in a pattern of deceptive misconduct. *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *10 (Del. Ch. Jan. 20, 2009). "A claim for injunctive relief must be supported by the allegation of facts that create a reasonable apprehension of a future wrong." *Id.* Smash has failed to demonstrate a reasonable apprehension of Dumpster Devil repeating the misleading statements addressed in the Injunction Decision.

The court's ruling in the Injunction Decision enjoined Dumpster Devil "from making statements about (i) Smash's drum lacking guards, (ii) the Smash truck's slides needing daily greasing, and (iii) the Dumpster Devil truck weighing less than 26,000 pounds and not requiring a commercial license." 2020 WL 4692287, at *20. Dumpster Devil removed the first two misleading statements from its webpage and the parties stipulated to an order vacating the portion of the Injunction Decision addressing Dumpster Devil trucks weighing less than 26,000 pounds. Dkt. 146. Dumpster Devil thus addressed the issue.

At trial, Smash provided no evidence that Dumpster Devil returned the misleading statements to its webpage after the Injunction Decision. Smash also failed to show that Dumpster Devil made the misleading statements as an ongoing pattern of deceptive conduct that could support a reasonable apprehension of future misconduct. That failure is fatal to its request for permanent injunctive relief, because DUDTPA "simply does not address" isolated incidents. *Grand Ventures, Inc. v. Whaley*, 622 A.2d 655, 662 (Del. Super. Ct. 1992), *aff'd*, 632 A.2d 63 (Del. 1993); *accord CoreTel Am., Inc. v. Oak Point P'rs, LLC*, 2022 WL 2903104, at *9 (Del. Super. Ct. July 21, 2022); *EDIX Media Gp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006).

The fact that Dumpster Devil's principals had a good faith belief for their statements also militates against a permanent injunction. Dumpster Devil's comparison page was written in an aggressive and combative style, but Dumpster Devil's principals did not make up its contents. They had a good faith basis for believing that Dumpster Devil's truck was superior in those respects. The context surrounding Dumpster Devil's misleading

58

statements points more to isolated incidents of mistaken belief rather than a pattern of making misrepresentations about a competitor. Permanent injunctive relief under DUDTPA is therefore inappropriate.

In response, Smash points to statements Dumpster Devil added to its website after the court issued the Injunction Decision. The first statement made the following claim:

> Smash My Trash has been trumpeting that it sued Dumpster Devil in an attempt to put us out of business. On August 13, 2020[,] the Delaware Court denied Smash My Trash's "scattershot" attempt to put Dumpster Devil out of business, ruling that Smash My Trash had not proven a single violation of its trade secrets or confidential information.

JX 191 at 1. Smash also points to another webpage where Dumpster Devil stated, "We defeated Smash My Trash's frivolous attempt to stifle competition." JX 190 at 3. Smash claims these two statements mislead consumers by falsely implying the case had been decided on the merits in favor of the defendants and ignoring the court's other rulings. Dkt. 323 at 63.

Smash claims Dumpster Devil's statements about the Injunction Decision evidence a pattern of misstatements, but neither statement was false. Smash had sought a business-stopping injunction, which the court refused to grant. Injunction Decision, 2020 WL 4692287, at *20. The court ruled that Smash had demonstrated a reasonable likelihood of success on the merits only for its claim for fraud and its claim under DUDTPA, not for any violations of DUTSA or for misuse of confidential information. *Id.* at *16–18. The court granted only a narrow injunction addressing specific statements on Dumpster Devil's website, which Dumpster Devil removed.

Second, Dumpster Devil's statements about the Injunction Decision would constitute another isolated incident rather than a pattern of misconduct. Smash attempts to link the previously enjoined statements to the characterization of the Injunction Decision, but the connection is too tenuous. The first set of problematic statements were removed and have not returned. The statements about the Injunction Decision—aside from not being false—do not attack Smash's products. They described contentious litigation between two competitors in the market, giving them a different character than the earlier statements. Smash failed to establish a pattern of misconduct for which there is a reasonable apprehension of future misconduct.

If Dumpster Devil adds false statements to its website, then Smash can bring another suit under DUDTPA. Until then, a permanent injunction is unwarranted.

### 3. Smash's Request For Treble Damages

As a remedy for the violations that Smash proved at trial, Smash also asks the court to award treble damages. Section 2533(c) of DUDTPA states that "[t]he relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State." 6 *Del. C.* § 2533(c). It provides further: "If damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved." *Id.*

DUDPTA does not provide an independent cause of action for damages. It "provides solely for injunctive relief although damages may also be awarded when otherwise permitted by law . . . . [It] was not intended to create a new cause of action distinct from the common law protections designed to secure businesses against the deceptive trade

60

practices of others." *Grand Ventures*, 632 A.2d at 68. "DUDTPA is not a platform for an independent common law damage suit." *Dionisi v. DeCampli*, 1995 WL 398536, at *13 (Del. Ch. June 28, 1995). If there is evidence in the record to support damages, then those damages can be trebled, but "the absence of evidence in the record suggesting actual damages prevents plaintiff from recovering treble damages under Section 2533(c) . . . ." *ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1216 (D. Del. 1994). The language of Section 2533(c) "makes an award of actual damages a prerequisite of any award of treble damages." *Id.*

Smash failed to prove actual damages. Smash pursued only two claims at trial: its common law fraud claim and its claim under DUDTPA. As previously discussed, DUTSA preempted the fraud claim, and Smash could not establish causally related damages in any event. DUDTPA does not provide an independent source of damages.

### 4. Smash's Request For Attorneys' Fees

Smash finally requests an award of attorneys' fees. Section 2533(b) of DUDTPA provides that "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has wilfully engaged in a deceptive trade practice." 6 *Del. C.* § 2533(b). Each side claims that it is entitled to attorneys' fees as the prevailing party.

As an initial matter, a plaintiff need not receive a remedy under Section 2533 to be considered a prevailing party under DUDTPA. *See Dionisi*, 1995 WL 398536, at *18. A plaintiff can prove a violation of DUDTPA while being unable to obtain any of the remedies that Section 2533 provides. *See id.* A judgment establishing a violation is all that

is necessary to prevail. *See Rudenberg v. Chief Deputy Att'y Gen. of Dep't of Just.*, 2017 WL 7000854, at *8 (Del. Super. Ct. Dec. 8, 2017).

Smash established two violations of DUDTPA and thus is a prevailing party. But to recover attorneys' fees, Smash needed to prove that Dumpster Devil willfully violated DUDTPA or that this was an "exceptional case." To reiterate, DUDTPA states that "a wilful violation occurs when the person committing the violation knew or should have known that the conduct was of the nature prohibited by this subchapter." *Id.* § 2533(e). DUDTPA does not define what "exceptional" means. The United States District Court for the District of Delaware compared Section 2533(b) to a similar federal statute and found that a case is exceptional "where the infringing acts can be characterized as malicious, fraudulent, deliberate, or willful." *Accu Pers.*, 846 F. Supp. at 1216 (cleaned up). For conduct to meet that standard, the court must "make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement before a case qualifies as exceptional." *Id.* (internal quotations omitted).

As previously discussed, Smash failed to prove that Dumpster Devil acted wilfully. Instead, the evidence at trial showed that Dumpster Devil had a good faith basis for making two of its statements, and the parties stipulated that the third statement was correct. This case does not involve conduct that would allow Smash to recover attorneys' fees under Section 2533(b).

Dumpster Devil cannot recover its fees under DUDTPA either. Dumpster Devil was not a prevailing party, and Dumpster Devil did not prove that Smash pursued this case maliciously.

## C. Perri's Request For Attorneys' Fees Under DUTSA

Perri separately seeks to recover attorneys' fees on the theory that Smash brought its claim under DUTSA in bad faith. Perri argues that after the Injunction Decision, Smash knew that none of the information Perri received could qualify as a trade secret. Perri contends that Smash forced him to defend a specious claim only to drop the claim on the eve of trial. Section 2004 of DUTSA provides that "the court may award reasonable attorney's fees to the prevailing party" where "a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or wilful and malicious misappropriation exists." 6 *Del. C.* § 2004.

Smash dropped its claim under DUTSA on the eve of trial, making the defendants the prevailing party. In the Injunction Decision, the court held that Smash had not established a reasonable likelihood of success on the merits of its DUTSA claim. 2020 WL 4692287, at *15. The court ruled that the information upon which Smash based its claim "does not qualify as trade secrets, at least in the form in which Smash presented the information to Perri." *Id.* at *14. The court also concluded that "much of this information was not secret at all" because Smash made it publicly and freely available "to differentiate itself as part of its effort to sell franchises." *Id.* Notably, the court based these findings on the record as it existed at that time. *See id.* at *14–15. After the Injunction Decision, the parties engaged in discovery on the DUTSA claim. The parties also participated in an unsuccessful mediation on the remaining issues, including the DUTSA claim.

Under Section 2004, a prevailing party must show that the claim fits under one of the enumerated circumstances warranting an award of attorneys' fees. *See* 6 *Del. C.* § 2004.

63

Where a defendant prevails, it must demonstrate that the plaintiff brought the misappropriation claim in bad faith. *See id.*; *Incyte Corp. v. Fexus Biosciences, Inc.*, 2019 WL 2361535, at \*2 (Del. Super. Ct. May 7, 2019).

> The "bad faith" element of DUTSA requires objective speciousness of the plaintiff's claim and its subjective bad faith in bringing or maintaining the claim. Objective speciousness exists where the action superficially appears to have merit, but there is a complete lack of evidence to support the claim. Subjective bad faith may be inferred by evidence that the plaintiff intended to cause unnecessary delay, filed the action to harass or harbored an improper motive. Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel. A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence.

*Incyte Corp.*, 2019 WL 2361535, at \*2 (cleaned up). The fact that a plaintiff drops a claim in the later stages of litigation is not sufficient to find bad faith under DUTSA. *See Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at \*16 (Del. Ch. Nov. 18, 1992) (Allen, C.).

Perri has failed to prove that Smash's DUTSA claim was objectively specious. From reading the Injunction Decision, one could surmise that Smash's claim under DUTSA was among its weaker theories, but that does not mean the claim was frivolous. Smash started out with a genuine belief that some of the information that Perri received constituted trade secrets. The Injunction Decision was a preliminary ruling, and as this decision has shown, a court may revisit conclusions reached on a preliminary record when the case reaches the trial stage. Although Smash dropped its DUTSA claim on the eve of trial, that decision was part of Smash's effort to simplify the issues. The parties had recently engaged in an unsuccessful mediation, and Smash may have made the decision to refine its theories based

64

in part on information gleaned from the mediation. A decision to narrow the issues for trial is generally commendable.

Perri failed to prove that Smash pursued an objectively specious claim. He therefore cannot recover his fees and expenses under DUTSA.

## III.     CONCLUSION

Judgment will be entered in favor of Perri on the fraud claim. Judgment will be entered in favor of Smash declaring that Dumpster Devil's statements regarding the absence of guards and daily greasing were deceptive practices under DUDTPA. Judgment will be entered in favor of Dumpster Devil declaring that its statement regarding the weight of its trucks was not a deceptive practice under DUDTPA. Smash is denied any relief under DUDTPA other than those declarations. Each party will bear its own costs.

The parties will confer regarding a form of final order. If there are other issues that need to be addressed to bring this matter to a conclusion at the trial level, then the parties will submit a joint letter identifying those issues and proposing a schedule for addressing them.